IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

|  |  |  |
|---|---|---|
| MARY MILLER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 5:20-cv-00003 |
| | ) | |
| MEDIKO, INC., | ) | By:  Elizabeth K. Dillon |
| | ) | United States District Judge |
| Defendant. | ) | |

**MEMORANDUM OPINION**

Mary Miller worked as a pharmacy nurse for Mediko, Inc. at Augusta Correctional

Center (ACC).  She alleges claims against her former employer for sexual discrimination,

harassment, and retaliatory/constructive discharge in violation of Title VII.  Mediko moves for

summary judgment and to strike an exhibit to Miller's opposition brief.  (Dkt. Nos. 46, 53.)  For

the reasons stated below, the court will grant the motion to strike, grant the motion for summary

judgment as to the retaliation claim, and deny the motion for summary judgment as to the

harassment claim.

I.  BACKGROUND

**A.  Mediko and ACC**

Mediko is a third-party contractor based in Richmond that provides healthcare services to

correctional facilities, including ACC, a facility within the Virginia Department of Corrections

(DOC).  The services provided at ACC include operation of a pharmacy in the medical building,

which is staffed by Mediko's nurses and at least one DOC officer.  There are two 12-hour

pharmacy shifts—the day shift (9:00 a.m.–9:30 p.m.) and the night shift (9:00 p.m.–9:30 a.m.).

During shift change, the outgoing and incoming nurses are required to count medications

together, referred to as the "shift count."  The shift count lasts between 20–30 minutes.  (Miller Dep. 149–50, Dkt. Nos. 47-1, 49-1, 52-2.)

Mediko hired Miller in May 2018 to work as a nurse in the pharmacy at ACC.  Miller was 21 years old, and this was her first job out of nursing school.  Miller's compensation included a sign-on bonus of $7,500 paid in three installments the last of which was due on June 7, 2019.  To be eligible for her bonus, Miller was required to be in good standing without any disciplinary action.

Miller received and reviewed a copy of Mediko's Employee Handbook, which contains several equal opportunity and anti-discrimination policies.  (Handbook, Dkt. No. 47-2.)  The Handbook requires any employee who believes he or she has been harassed to "report the situation immediately to your manager, Human Resources, or any other member of management with whom they feel comfortable."  (Handbook 5–6.)  It further requires "anyone" witnessing or receiving a report of possible harassment to immediately report it to Human Resources.  (*Id.*)  Mediko "will investigate all reports promptly, thoroughly, and as confidently as possible with no adverse action being taken against the employee who files the complaint."  (*Id.*)

Plaintiff's manager was Natalia Sizemore.  Sizemore reported to Derinda Dameron, Director of Nursing.  Above Dameron was April Hanley, the Health Service Administrator.  Sizemore, Dameron, and Hanley worked onsite at ACC.  Mediko's Human Resources department, working offsite, included Stephanie Woodrum and Shasta Hypes.

Mediko employees are also required to comply with all DOC policies, procedures, and regulations, including Operating Procedure 101.2–Equal Employment Opportunity, which defines harassment, discrimination, and retaliation and sets forth the procedure for reporting such conduct.  The DOC EEO Policy prohibits discrimination based on sex, including sexual

harassment, of any employee or third-party contractor; states that the DOC will not tolerate such conduct or retaliation for reporting such conduct; and requires both employees and third parties to submit complaints as soon as possible to either the DOC Human Resources Officer at ACC or directly to the Office of Equal Employment Opportunity in writing.

Miller received a copy of the DOC EEO Policy on May 25, 2018, during mandatory training provided by the DOC.  The DOC Training included sexual harassment training provided by DOC Human Resources Officer Steven R. Hearn.  (Hearn Decl. ¶ 5, Dkt. No. 47-3.)  During the DOC Training, Hearn advised all participants, including Miller, that sexual harassment would not be tolerated at ACC and that it must be reported to him.  Hearn advised all participants that he had an open-door policy so that anyone could report any concerns at any time.  Participants also viewed the DOC Fraternization & Sexual Harassment Training Video.[1]

After completing the DOC Training, Miller was assigned to the day shift in the pharmacy, working three 12-hour days that alternated every other week between weekdays and weekends.  In addition to Miller, the pharmacy was staffed with 1–2 other nurses during the day shift and one nurse during the night shift.

**B.  Winter 2018–May 2019 Comments by Couser and Reports to Hanley and Dameron**

According to Miller, beginning in the winter of 2018, Walter Couser, a male Mediko pharmacy nurse, began making inappropriate comments to her.  Couser worked the night shift in

---

[1] Miller refutes the sexual harassment training and receipt of the DOC EEO Policy.  In her submissions in opposition to Mediko's motion for summary judgment, Miller provides a declaration stating that "As far as I know, I have never met Hearn or received any sex harassment training from him."  (Dkt. No. 49-15.)  At her deposition, however, Miller testified that she received between 40 and 80 hours of "training from the Department of Corrections . . . before [she] actually started, you know, walking into the facility to give health care treatment to inmates."  (Miller Dep. 82.)  Miller testified that this training was reflected on Exhibit 5 to her deposition, the agenda for her first day of training.  (Dkt. No. 52-3.)  As indicated on the top of the exhibit, Miller received training on Sexual Harassment from Steve Hearn on May 25, 2018, her first day of work at ACC.  (Miller Dep. 81.)

the pharmacy.  Thus, his schedule overlapped with Miller's schedule during the shift count for two days every other week.  Couser was a co-worker, not Miller's supervisor.

Couser compared her to another nurse, Sarah Fitzgerald, and remarked that the only way he could tell them apart was that Miller "has bigger boobs" and further stated he would like for them to come stay in his hotel room.  (Miller Dep. 315.)  Couser made the comments comparing Miller and Ms. Fitzgerald "around five times."  (*Id.* at 316–17.)  Couser asked Miller to stay in his hotel room "on multiple occasions."  (Miller Dep. 228.)

Miller complained about these issues to Hanley and Dameron.  Miller recalls being told by Hanley that she just "needed to shrug them off because they knew that that's how men in—or they knew it was my first go-round in prison, and that's just how men acted."  (Miller Dep. 168.)  When the harassment continued, Miller complained to Dameron, who responded that Couser was harmless and Miller just need to tell him to stop.  Miller contends she began complaining about Couser in the winter of 2018.

At other times, Couser referred to himself as "Daddy Couser" and stated he needed a "young slut with daddy issues."  (Miller Dep. 224–25.)  Miller recalls that Couser referred to himself as "Daddy Couser" more than once but less than five times.  Couser stated that he needed a "young slut with daddy issues" multiple times between the winder of 2018 and May 2019.

In February 2019, Couser told Miller that if he were "30 years younger, she would be his."  Couser was 63 years old.  Miller interpreted this comment in a romantic, as opposed to a sexual way.  Couser also used the phrase "what daddy Couser wants, daddy Couser gets."  (*Id.* at 227–28.)  Miller told Couser that his comments were unwanted and she did not appreciate the way he was talking to her.  Couser apologized and said he would stop.

4

### C.  February 2019 Report About Hanley Unrelated to Couser

On February 7, 2019, Miller submitted a detailed written report to Dameron raising "numerous concerns" about Hanley fraternizing with an inmate.  (Miller Dep. 166, 168, 172.) Miller also raised concerns about a disciplinary write-up she received that jeopardized the remaining portion of her sign-on bonus and to address what she described as "petty drama" between Miller, Hanley, and Dameron.  (Miller email to Dameron (February Report), Dkt. No. 47-6.)  Mediko and the DOC investigated the allegations about Hanley, which ultimately led to Hanley's termination in April 2019.  Miller was satisfied with the investigation and outcome. The February Report does not reference Couser or any sexual harassment, discrimination, or retaliation.

Hanley was terminated because she violated the fraternization policy with an offender. This policy does not require a physical, sexual, or romantic relationship.  Rather, it encompasses any improper contact or communications with offenders.  Hanley had emailed with an inmate platonically, acting as a conduit between an inmate and his family.  (Hanley Dep. 15–16, Dkt. No. 52-4; Lokey Dep. 66–67, Dkt. No. 52-5.)

### D.  April 25, 2019 Report About An Inmate Unrelated to Couser

On April 25, 2019, Miller submitted a written report to the DOC because an inmate was making inappropriate comments to her, including: "Has anyone ever told you that you have some sexy lips?"  (Miller email to J. Clifton (April Report), Dkt. No. 47-7.)  The DOC acted on the report and charged the inmate.  The April Report does not reference Couser or any other sexual harassment, discrimination, or retaliation.

**E. May 13, 2019 Report About Couser, and Couser is Warned**

On May 10, 2019, Couser told Miller he had a dream about her wearing thigh high boots and lingerie, and it turned into a wet dream.  Miller submitted a written report to Dameron on May 13.  (Miller email to Dameron (May Report), Dkt. No. 47-8).)  The May Report indicates that Couser's conduct made the workplace "uncomfortable."  (*Id.*)

Dameron sent the May Report to Human Resources.  The May Report alleged that Couser made inappropriate sexual remarks to Miller that included referring to himself as "Daddy Couser," saying he needs a young slut with daddy issues and expressing his desire to have Miller stay in his hotel room and if he was 30 years younger Miller would be his.  Couser had never been reported for sexual harassment prior to Miller's allegation.

Upon receiving the May Report, Mediko opened an investigation, obtaining a statement from Sarah Fitzgerald, who was referenced in the May Report.  Fitzgerald confirmed Couser used the language reported by Miller but characterized the comments as "slightly inappropriate and awkward" and "simply his way of joking."  Fitzgerald stated that Couser "never made any notions to inappropriately touch or make any advances.  It was always verbal jokes."  (Fitzgerald Statement, Dkt. No. 47-11.)

Mediko found Couser's comments inappropriate and issued a written warning and counseled Couser on May 17, 2019, including the "expect[ation] that Couser will refrain from comments of a sexual nature while in the workplace."  (Disciplinary Action Report, Dkt. No. 47-12.)  Couser acknowledged the written warning and agreed to change his behavior.

Testifying about his behavior, Couser noted that the nursing staff regularly engaged in sexual banter "to pass the time.  If you've ever been on the nursing floor, been around a bunch of nurses, their mouths are more grungier than most Marines and army guys."  (Couser Dep. 51–52,

Dkt. No. 49-10.)  When asked whether he made sexual comments at work, Couser admitted that "in nursing, there is a lot of banter going on.  We get to see everything, and we do take it to another level, like this one particular statement 'I want a young slut with Daddy issues," to which a female nurse offered, 'the next time she gets married, she was a rich guy with a twelve inch one.'"  (*Id.* at 50.)  Couser stated that in his years being a nurse, he always heard profanity and sexual comments.  "It just keeps the job upbeat."  (*Id.* at 94.)  Couser hugged most of the nurses at work and told them he loved them, and no one at Mediko told him not to do that.  (*Id.* at 66–67.)

**F.  Sign-on Bonus and Threat of Lawsuit Regarding Bonus**

On June 5, 2019, Miller learned that she would not receive her sign-on bonus because of disciplinary write-ups that occurred in December 2018.  According to a fellow nurse, Cheri Onuegbu, Miller became "hysterical," "vowed that she was going to get" Mediko, was going to "make Mediko pay," "sue Mediko," "get all her documentation as she was going after Mediko and Couser," "walk out and not do her job," and "quit after she received her bonus." (Declaration of C. Onuegbu (Onuegbu Decl.) ¶¶ 4–5, Dkt. No. 47-13.)  Miller disputes this characterization.  According to Miller, she was never hysterical about the bonus and did not threaten to sue Mediko.  She states that she never complained to Ms. Onuegbu about Couser "because she was merely a coworker and I knew that she and Couser were good friends, and she was very angry with me when he lost his job."  (Miller Decl. ¶ 4, Dkt. No. 49-15.)

Later that day, Miller sent a detailed email to Dameron explaining why she should receive her sign-on bonus.  Her email did not reference Couser or any harassment, threats, or retaliation.  Miller also contacted Mediko's Human Resources department the following morning, exchanging seven emails in the morning and afternoon.  After looking into the issue,

Human Resources ultimately determined that Miller was qualified for the final installment of her sign-on bonus, which Miller received.

### G.  June 6, 2019 Report About Couser, and Couser is Terminated

On June 6, 2019, Miller made a second report about Couser concerning conduct that allegedly occurred on June 1 and 2, 2019.  (Miller Written Statement (June Report), Dkt. No. 47-16.)  Miller reported that Couser made comments about a "sexy Asian" woman he had seen at the gym, putting his arm around Miller like a "one-arm hug" when telling her about it.  (Miller Dep. 253–55.)  Miller also reported that Couser made comments that referenced violence against women.  "After an inmate came to the window stating that I was going to get beat up one day, I walked away saying out loud I would do whatever it takes to defend myself against a man. Nurse Couser spoke up and told me that chivalry is dead and he would beat a woman like a man and she would either end up in the hospital or grave if he is angry enough."  (Dkt. No. 47-5 at 7.) Miller continued to engage in the conversation, telling Couser it "makes him less of a man to think that putting his hands on a woman is okay."  Couser then allegedly responded by stating that is what he believes and then said, "I could hurt you very badly, sweetheart" and patted her on the shoulder.  (Miller Dep. 253–55.)  Couser is six feet tall and weighs more than 200 pounds. Miller is 5' 2" and 112 pounds.

Couser offered a different version of these events during Mediko's investigation, but he admitted to using "risky language" and "sexual comments."  (Hypes Decl. ¶ 7, Dkt. No. 47-10.) Based on the results of its investigation, Mediko terminated Couser on June 20, 2019, for making inappropriate comments after receiving a warning.

**H.  Miller's Conduct During June Report Investigation**

After receiving the June Report, Mediko advised Miller and Couser not to have any unsupervised contact while it conducted its investigation.  Specifically, another employee was scheduled to be present during the shift count, the only time Miller and Couser worked together. The other employee present would be in addition to the DOC officer present in the medical building.

Miller objected to this accommodation "from the start" because she thought there was "going to be obvious bias" as the other nurses were friends with Couser.  (Miller Dep. 260–62.) Human Resources offered Miller the opportunity to work at another location, Coffeewood Correctional in Mineral, Virginia, the closest facility to ACC, during the investigation.  Miller declined because of the short notice and the long drive (three hours round trip) from her home. Miller did not return to work on June 7 because she did not feel safe in the work environment. She claimed that Dameron was retaliating against her by requiring her to perform the shift count with Couser and another employee present. Miller eventually returned to work under this procedure on June 12.  Mediko did not object to Miller taking this time off work.

On June 15, 2019, Miller had an altercation with Dameron that led them both to submit reports to Human Resources.  Miller described the altercation as follows:

> I remember seeing her and Walter Couser in the medical records room, and they were whispering and the lights were off, so I assumed she was updating him about the investigation or they were just chitchatting about it.  So I went to her office after he had parted ways, and I asked her.  I said, do you have an update on the investigation.  And she stated, No.  I said, Well, I had seen you and Couser in the medical records room alone, talking, whispering, so I figured you had an update on the investigation.  And she told me it was none of—she became very hostile immediately, and defensive, and she said, It's none of your business what I talk to my other staff about.  Which, to me, if there's an ongoing investigation, and [Dameron] who is both of our supervisor is whispering in a room

9

> alone with him, it kind of seemed like a conflict of interest.  So she
> began getting loud with me, and I was trying to voice my side of it.
> And I told her I didn't feel like I could report anything to her because
> it wasn't being handled—there was very obvious bias and tension,
> and it became a very hostile work environment.

(Miller Dep. 287–88.)  Miller recalled that Dameron "was friends with Walter Couser."  (Miller

Dep. 185.)

> She didn't—it was very clear that she had some kind of bias there if
> she had been making the comments about me to other staff
> members.  She had told me that he was her only night shift nurse
> that was willing to work every weekend and he wasn't going
> anywhere.  She was still laughing and joking with him when the
> investigation was opened about him and I.  So there was very clear
> bias there that was hard to miss.

(*Id.*)

Dameron reported that she felt threatened because Miller entered her office in an

aggressive and unprofessional manner accusing her not only of favoritism, but also of creating a

hostile work environment because Miller had to perform shift count with Couser and another

witness present.  Miller reported that Dameron was the one yelling and that she shut her door.

Human Resources opened an investigation and obtained a statement from nurse Onuegbu,

who witnessed the incident.  Onuebu reported that Miller was "rude and unprofessional," "totally

inappropriate," "insubordinate," and "aggressive" towards Dameron.  According to Onuegbu, it

was Miller, not Dameron, who was creating an "uncomfortable and hostile environment."

(Hypes Decl. ¶ 15.)  Human Resources issued a written reprimand to Miller and counseled her on

her behavior.

Miller disagreed with the reprimand and contacted the Director of Human Resources to

appeal the decision.  On July 8, 2019, Human Resources advised Miller that, based on the

statements received, they agreed with the write-up.  Miller submitted her resignation the

following day, July 9, 2019, alleging that she was leaving due to an "ongoing hostile work environment."  (Miller Dep. 310–11.)  Miller's last day of work was July 13, 2019.

## I.  Sexual Comments by DOC Officers

Miller also cites sexual comments by certain DOC officers as contributing the hostile work environment.  On June 1, 2019, DOC officers connected to Miller on social media commented to Miller about pictures she had posted of her in a bikini and a boudoir photo shoot.  Specifically, a DOC officer commented, "if you keep posting those photos," and then trailed off.  Later, another DOC officer commented to other officers in Miller's presence, "have y'all seen her photos on social media?"  Another DOC officer responded that he "had to stop scrolling when he seen it."  After Miller commented on what she was wearing and when the photos were taken, another DOC officer said "I seen one of the photos with you holding a gun and now my dick is raw from stroking it."  (Dkt. No. 47-5 at 10–11.)

Miller did not report the conduct to the DOC or to Mediko.  Rather, Miller discussed the comments with her co-workers, who reported the allegation to Mediko on June 6, 2019.  Upon learning of the alleged conduct, Mediko obtained a statement from Miller.  Mediko then reported the conduct to the DOC as required by the DOC EEO Policy.  Mediko instructed Dameron to remind Miller that people do discuss what she posts on social media and to be mindful.

## J.  DOC Investigation of Miller Smuggling Contraband into ACC

On or about June 21, 2019, Miller was questioned by the DOC as part of an investigation into Miller allegedly bringing contraband into ACC.  The investigation was initiated based on DOC officer Terry Ryder's review of historical security scans that identified two individuals whose scans were said to have contraband.  Officer Ryder believed scans of Miller showed an Apple/iPhone watch on her person on twelve occasions between November 2018 and June 2019.

Officer Ryder sent this information to DOC Investigator Benjamin Lokey.  Investigator Lokey and another investigator, Lisa Quesenberry, interviewed Miller on June 23, 2019, with Officer Ryder present.  Lokey testified that Miller was asked if she brought an Apple watch into ACC.  Miller denied the accusation, claiming that the object on the scan was her ID badge.  The investigators did not believe Miller.  Miller went through the scanner to prove her explanation.  The investigators did not believe the scan supported her claim.  No further questions were asked of Miller.

Miller testified that the investigation did not involve an Apple watch.  Instead, Miller alleges that Lokey accused her of smuggling drugs into ACC in her vagina.  No action was taken against Miller.  She was embarrassed because employees and inmates saw her walking with the DOC investigators and thought she had been terminated.  Mediko was not involved in this investigation.

## II.  ANALYSIS

### A.  Motion to Strike

The court's scheduling order in this case provides that "[e]xclusive of any accompanying exhibits, a brief may not exceed 25 pages in length using standard margins and double-spaced lines, unless the filing party first obtains leave of the court after showing good cause why a longer brief is necessary."  (Dkt. No. 25, ¶ 14.)  Both parties obtained leave to file 35-page briefs.  Attached to Miller's brief as an exhibit is a 12-page document titled "Plaintiff's Comments Regarding Defendant's 'Statement of Undisputed Facts.'"  (Dkt. No. 49-17.)  The court agrees with Mediko that the submission of this document is an impermissible attempt to

expand the briefing page limitations.  Therefore, the court will grant Mediko's motion to strike the exhibit.[2]

## B.  Motion for Summary Judgment

Summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A material fact is one that "might affect the outcome of the suit under the governing law."  *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A dispute of material fact is "genuine" if sufficient evidence favoring the non-moving party exists for the trier of fact to return a verdict for that party.  *Anderson*, 477 U.S. at 248–49.

The moving party bears the initial burden of showing the absence of a genuine dispute of material fact.  *Celotex*, 477 U.S. at 323.  Once the moving party makes this showing, however, the opposing party may not rest upon mere allegations or denials, but rather must, by affidavits or other means permitted by the Rule, set forth specific facts showing that there is a genuine issue for trial.  *See* Fed. R. Civ. P. 56(c), 56(e).  All inferences must be viewed in a light most favorable to the non-moving party, but the nonmovant "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."  *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985).  Although the nonmoving party's proffered evidence need not itself be admissible, it must be "capable of being reduced to admissible evidence at trial."  *U.S. Dep't of Hous. & Urban Dev. v. Cost Control Mktg. & Sales Mgmt. of Va., Inc.*, 64 F.3d 920, 926 n.8 (4th Cir. 1995).

---

[2]  This decision does not affect the court's summary judgment ruling.

### 1. Hostile work environment

Under Title VII, employers are prohibited from discriminating against individuals "with respect to . . . terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2. "Since an employee's work environment is a term and condition of employment, Title VII creates a hostile work environment cause of action." *Walker v. Mod-U-Kraf Homes, LLC*, 775 F.3d 202, 207 (4th Cir. 2014). A plaintiff alleging a hostile work environment must prove four elements: (1) that there was unwelcome conduct, (2) that the unwelcome conduct was based on her sex, (3) that the unwelcome conduct was sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive working environment, and (4) that the conduct is imputable to the employer. *Id.*

Reviewing the evidence in the light most favorable to plaintiff, plaintiff has established the first two elements: unwelcome conduct based on Miller's sex. *See Hoyle v. Freightliner, LLC*, 650 F.3d 321, 331 (4th Cir. 2011) ("An employee is harassed or otherwise discriminated against because of his or her gender if, but for the employee's gender, he or she would not have been the victim of discrimination."). The last two elements require further inquiry.

### a. Severe or pervasive

The severe or pervasive prong has both subjective and objective components, and it requires a plaintiff to establish that he or she "perceived—and that a reasonable person would so perceive—the environment to be abusive and hostile." *Walker*, 775 F.3d at 208. In applying this test, the court must consider the totality of the circumstances faced by the plaintiff, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys, Inc.*, 510 U.S. 17, 23 (1993). The test is

intended to "filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1988).

Title VII "is not a general civility code." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998).  "While no one condones boorishness, there is a line between what can justifiably be called sexual harassment and what is merely crude behavior." *Ziskie v. Mineta*, 547 F.3d 220, 228 (4th Cir. 2008).  Activities like simple teasing, offhand comments, and off-color jokes, while often regrettable, do not cross the line into actionable misconduct. *EEOC v. Fairbrook Med. Clinic, P.A.*, 609 F.3d 320, 328 (4th Cir. 2010) (citing *Faragher*, 524 U.S. at 788).  But there is a difference between "generalized" statements that pollute the work environment and "personal gender-based remarks" that single out individuals for ridicule. *Id.* (citing *Conner v. Schrader-Bridgeport Int'l, Inc.*, 227 F.3d 179, 197 (4th Cir. 2000)).  "Common experience teaches that the latter have a greater impact on their listeners and thus are more severe forms of harassment." *Id.*

Mediko emphasizes various factors that weigh against a conclusion that the harassment experienced by Miller was severe or pervasive: Couser was the only person who sexually harassed Miller[3]; Couser was Miller's co-worker, not her supervisor or in any position of authority with respect to Miller; and Miller only worked with Couser for two days every other week, or four days per month, for a short period of time during shift changes.  Thus, Mediko characterizes the harassment as isolated and sporadic, not pervasive.  Mediko concedes that Couser's behavior was crude, inappropriate, and immature.  Still, Mediko argues that it was not

---

[3] Here, the court is not considering the alleged harassment by DOC guards and inmates.

severe or pervasive enough to create a workplace "permeated with discriminatory intimidation, ridicule, and insult." *Harris*, 510 U.S. at 21.

The court agrees that much of Couser's behavior can be described as crude and "boorish." However, Couser's behavior was also sexually explicit, and it included "personal gender-based remarks," *Fairbrook*, 609 F.3d at 328, such as Couser's comments on Miller's breast size and invitations to join him in a hotel room. More importantly, Couser's conduct was physically threatening. Couser told Miller he would "beat her like a man," that she would "end up in the hospital or in the grave," and that he could "hurt her very badly," then touched her shoulder to emphasize the point. This abusive behavior, as alleged, is worse than boorish. And even though Couser was not in a position of authority over Miller, the age and size discrepancy between Couser and Miller heightened the threat to Miller. *See Ziskie*, 547 F.3d at 227 (noting that hostile work environment cases that have succeeded in this circuit "have often involved a disparity of power between the harasser and the victim"). Again, the court recognizes that Couser was a co-worker and not in a position of power as to the terms and conditions of Miller's employment. However, Couser's age, lengthy experience as a nurse, and apparent rapport with supervisors such as Dameron, combined with Miller's youth and lack of experience, suggest an imbalance of power between Couser and Miller. In these circumstances, there is an issue of fact as to whether Miller perceived, and a reasonable person would perceive, the environment to be abusive and hostile.

### b. Imputable to employer

If, as here, the harassing employee is the victim's co-worker, "the employer is liable only if it was negligent in controlling working conditions." *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 278 (4th Cir. 2015) (citing *Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2439

(2013)).  "The employer may be liable in negligence if it knew or should have known about the

harassment and failed to take effective action to stop it."  *Ocheltree v. Scollon Prods., Inc.*, 335

F.3d 325, 333–34 (4th Cir. 2003).  A plaintiff seeking to impute liability to her employer for

harassment by a co-worker may not be able to establish the employer's negligence if she did not

report the harassment.  *Boyer-Liberto*, 786 F.3d at 278.  Evidence relevant to the negligence

inquiry includes evidence that an employer "failed to respond to complaints."  *Vance*, 133 S. Ct.

at 2453; *id.* at 2464 ("An employee may have a reputation as a harasser among those in his

vicinity, but if no complaint makes its way up to management, the employer will escape liability

under a negligence standard.") (Ginsburg, J., dissenting).  Ultimately, an employer cannot avoid

Title VII liability for coworker harassment by adopting a "see no evil, hear no evil" strategy.

*Ocheltree*, 335 F.3d at 334.  "Knowledge of work place misconduct may be imputed to an

employer by circumstantial evidence if the conduct is shown to be sufficiently severe or

pervasive so that a reasonable employer, intent on complying with Title VII, would be aware of

the conduct."  *Spicer v. Com. of Va., Dep't of Corr.*, 66 F.3d 705, 710 (4th Cir. 1995).

Mediko argues that it was not negligent because Miller had multiple avenues to lodge

complaints about harassment, pursuant to Mediko's anti-harassment and the DOC's EEO Policy,

and she failed to take advantage of these avenues, at least initially.  Moreover, when Miller did

report misconduct, the process worked, as Couser was issued a warning and ultimately was

terminated.  However, Miller has testified that, prior to Couser's warning and termination in

2019, she reported issues to Hanley and Dameron and her reports fell on deaf ears and were not

investigated.  According to Miller, she was told by Hanley and Dameron that her concerns were

not important and that she just needed to deal with this type of work environment.  (*See* Miller

Dep. 168 (testifying about conversations with Hanley concerning "how I looked, how I dressed,

the comments about Walter Couser making and I needed to shrug them off because they knew that that's how men in—or they knew it was my first go-round in prison, and that's just how men acted").) This testimony, along with other evidence in this case, such as Couser's testimony about the conduct of nurses, suggests that there was a permissive environment toward this type of conduct. Miller also testified that she was trying to get contact information from Hanley and Dameron, so she could address her complaints about Couser from "the winter of 2018 to the time I left." (Miller Dep. 243–44 ("I was trying to get information from April Hanley and Derinda Dameron as to who to contact next. They were very adamant on chain of command."); *id.* at 246 ("Again, as I stated before, that's what I was trying to ask of Derinda Dameron and April Hanley, who I was supposed to go to if they could not handle the issue at hand at the facility.").) This evidence further demonstrates that Miller's direct supervisors were aware of the alleged harassment in 2018 but did not take action until later in 2019. Therefore, the court finds that there is an issue of fact as to whether Mediko's conduct towards harassment in its workplace was negligent, and as a result, whether Couser's harassment can be imputed to Mediko.

Mediko characterizes Miller's testimony about verbally reporting Couser's pre-June 2019 conduct to Hanley and Dameron as "self-serving," noting that Hanley and Dameron deny the accusations. Deposition testimony cannot be dismissed as self-serving and insufficient to create an issue of fact simply because it is disputed by the other side in litigation. Instead, the different version of events creates an issue of fact for trial. This case does not present a situation where a party offers a self-serving affidavit to contradict earlier deposition testimony. *See Hausfeld v. Love Funding Corp.*, 131 F. Supp. 3d 443, 465 (D. Md. 2015) ("When faced with a plaintiff's affidavit submitted in opposition to a motion for summary judgment that contradicts the plaintiff's earlier deposition testimony, courts may deny summary judgment if the issue of fact is

created by statements in the later-filed affidavit that differ from the deposition testimony.")
(citing *Rohrbough v. Wyeth Labs., Inc.*, 916 F.2d 970, 976 (4th Cir. 1990)).

Because there are issues of fact on whether the alleged conduct was severe or pervasive
and imputable to Mediko, the court will deny Mediko's motion for summary judgment on this
claim.

### 2. Retaliatory discharge

To establish a retaliation claim, Miller must show that (1) she engaged in a protected
activity, (2) Mediko took adverse action against her, and (3) a causal relationship existed
between the two events. *Ofoche v. Apogee Med. Group, Va., P.C.*, 815 F. App'x 690, 692 (4th
Cir. 2020) (citing *EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 405–06 (4th Cir. 2005)).
Miller claims that the adverse action she suffered was a constructive discharge. "Constructive
discharge may be an adverse employment action in violation of [42 U.S.C.] § 2003e–3(a) 'when
the record discloses that it was in retaliation for the employee's exercise of rights protected by
the Act.'" *Munday v. Waste Mgmt. of N. Am., Inc.*, 126 F.3d 239, 243 (4th Cir. 1997) (quoting
*Holsey v. Armour & Co.*, 743 F.2d 199, 209 (4th Cir. 1984)).

"The constructive-discharge doctrine contemplates a situation in which an employer
discriminates against an employee to the point such that her 'working conditions become so
intolerable that a reasonable person in the employee's position would have felt compelled to
resign.'" *Green v. Brennan*, 136 S. Ct. 1769, 1776 (2016) (quoting *Penn. State Police v. Suders*,
542 U.S. 129, 141 (2004)). In this situation, Title VII treats the employee's resignation as being
tantamount to an actual discharge. *Id.* A claim of constructive discharge therefore has two basic
elements: (1) plaintiff must show that she was "discriminated against by her employer to the

point where a reasonable person in her position would have felt compelled to resign," and (2) the plaintiff must show that she "actually resigned." *Id.* at 1777.

Importantly, the level of intolerability required to state a claim of constructive discharge is higher than the showing required for a hostile work environment claim. *Evans v. Int'l Paper Co.*, 936 F.3d 183, 193 (4th Cir. 2019); *see also Ulrey v. Reichhart*, 941 F.3d 255, 262 (7th Cir. 2019) ("A constructive discharge can result from a hostile work environment only if the environment is even more egregious than that needed for a hostile work environment."). The standard is not met by allegations suggesting that a reasonable person would have viewed resignation as the wisest or best decision. *Evans*, 936 F.3d at 193. Instead, the plaintiff must show that here working conditions became so intolerable that a reasonable person "would have had *no choice* but to resign." *Id.* (emphasis in original). "Unless conditions are beyond ordinary discrimination, a complaining employee is expected to remain on the job while seeking redress." *Suders*, 542 U.S. at 147). Thus, the Fourth Circuit has made it clear that "difficult or unpleasant working conditions, without more, are not so intolerable as to compel a reasonable person to resign." *Evans*, 936 F.3d at 193; *see, e.g.*, *Williams v. Giant Food, Inc.*, 370 F.3d 423 (4th Cir. 2004) (allegations that supervisors yelled at plaintiff, told her she was a poor manager, gave her poor evaluations, chastised her in front of customers, and forced her to work with an injured back did not "establish the objectively intolerable working conditions necessary to prove a constructive discharge"); *Ofoche*, 815 F. App'x at 692–93 (holding that allegations of "discipline, social ostracization, and assignment to less favorable working conditions" were not "sufficient to make a constructive discharge plausible"); *Stennis v. Bowie State Univ.*, 716 F. App'x 164, 167 (4th Cir. 2017) (affirming the dismissal of a constructive discharge claim where

the plaintiff alleged that she "received threatening and intimidating emails and that the environment was hostile").

While the court has found that there is a genuine issue of fact as to whether Miller can satisfy the standard for an actionable hostile work environment under Title VII, the court also finds there is no issue of fact under higher, more difficult to meet standard for constructive discharge.  Miller's statements about personal disputes with Dameron and Hanley, Dameron's speculative "bias" in during the investigation into Couser's conduct, and the conduct of DOC officers investigating the allegation that Miller smuggled contraband do not reflect conduct "beyond ordinary discrimination."  *Suders*, 542 U.S. at 147.  Moreover, the most extreme conduct towards Miller in this case was by Couser, yet by the time Miller resigned, Couser had already been terminated.  In this context, it is not possible for a jury to conclude that a reasonable person would have had no choice but to resign.

For these reasons, the court will grant summary judgment on the retaliatory discharge claim.

### III.  CONCLUSION

For the reasons stated herein, the court will grant Mediko's motion to strike, grant Mediko's motion for summary judgment on the retaliatory discharge claim, and deny Mediko's motion for summary judgment on the hostile work environment claim.  The court will issue an appropriate order.

Entered: September 3, 2021.

*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
United States District Judge